MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE,
v. Ross.

4-8222 202 S. W. 2d 365

Opinion delivered June 2, 1947.

*Henry Donham* and *Richard M. Ryan,* for appellant.

*William H. Glover,* for appellee.

GRIFFIN SMITH, Chief Justice. Each plaintiff sued for $3,000 to compensate personal injuries and each procured a judgment for $2,000. Each was seventy-eight years of age when the trial was had, and each, by substantial evidence, proved that he sustained serious injuries.

Van Veneer Company operates a plant at Malvern. Missouri Pacific, by contract, entered the premises with its spur track, over which logs for the mill and the materials it required, together with finished products, were transported. This track was laid near the veneer company's boiler room. Ross and Launius were standing on a concrete walk close to the boiler structure and approximately eight feet from the railway. They were talking with Ralph VanDusen, president of the veneer company, when the injuries occurred. A train, carrying supplies for an extension of the spur, backed in from a connecting line. The new construction was not a requirement of the veneer company, but was being built by Missouri Pacific as facilities for business beyond VanDusen's plant. Witnesses testified to a practice of placing strong planks across the railroad for the convenience of veneer company employes. These were under control of mill workers, but would sometimes be removed by railroad crewmen.

The day appellees were injured the engine with cars attached had backed into the siding or spur. The engine went eighty or eighty-five feet farther than it did when serving the veneer company. When the mission had been completed the train headed out, but in passing the point where Ross, Launius, and VanDusen stood, some part of the engine or tender struck one of three planks stacked near the track. This plank, according to VanDusen, was lying at an angle of about twenty-three degrees in respect of the rail nearest Ross, Launius, and VanDusen. It was on the fireman's side. The plank was shoved or pushed a short distance, (one witness said eight or ten feet) and precipitated against the bystanders with sufficient force to throw Ross and Launius to the concrete. VanDusen was struck and slightly injured, but did not fall.

The Railroad Company insists (1) that the verdicts were contrary to the law, contrary to the evidence, and contrary to the law and the evidence. In the manner presented this raises the question of sufficient evidence. It is argued that appellees—particularly Ross—were tres-

passers. Ross testified that he went to the plant to buy veneer for use in making a blackboard; Launius claimed he was seeking employment and that he had spoken to VanDusen concerning the matter.

The defendant did not prove any veneer company rule requiring applicants for work, or customers, to present themselves at a particular place; nor was there any attempt to show that it was not reasonable for these men to engage in conversation with VanDusen at the point where the three met, or to remain there as they did. It was shown that the boards (two inches thick, twelve inches wide, and twelve- or seventeen feet long) were not moved after the train backed in; hence, inferentially, appellant argues that some one connected with VanDusen's plant, or an independent agency, must have changed position of the top plank—otherwise it would have been hit when the train passed the stack on its inbound trip. The railroad company thinks that this inference necessarily arises from the fact that no one was known to have touched the boards during the interim in question.

Appellees advance what they think is a tenable explanation by pointing to that part of VanDusen's testimony where it is said that the top plank was at an angle of twenty-three degrees; that it was physically impossible for engine or tender-projections (such as steps, etc.) to have brushed by the board if but slight contact was made with its side and when direction of travel was toward the short end of the board; but on the return trip contact was such as to put pressure against the obstruction, forcing it from its position and hurling it against the plaintiffs.

There is no drawing or chart illustrating the physical situation upon which this inference rests. Personal testimony does not, in exact words, establish the concurring events in sequence precisely as we have presented them. Still, reasonable inferences deducible from pertinent evidence justified the jury in finding that some one negligently placed the planks too close to the railroad, and that their position should have been seen if an appropriate lookout had been kept. Therefore, when negli-

gence of the agency responsible for placement materially supplemented negligence of the appellant, and when injury resulted, Missouri Pacific cannot escape responsibility on the ground that its operatives did not in fact see the danger. It is true the engineer and fireman testified they were keeping a lookout; but it is equally true that the plank was not suddenly and unexpectedly put in the position from which it was dragged. It must have been on top of the two others, and it was bound to have extended far enough toward the track for some part of the engine to have struck it.

The second contention for reversal is that the Court erred in refusing to permit appellant to introduce in evidence the contract it had with the veneer company, wherein there are obligations as to maintenance. The Court was correct. Appellant could not contract against its negligence to the exclusion of rights accruing in favor of third parties. But even if this were legally possible the contract would not have a place in this record because at the time of injury the railroad company was extending the line for its own purposes.

It is next insisted that the Court acted prejudicially in requiring Dr. Hodges to answer the question, (asked by the appellees' attorney) "Isn't it reasonably possible that from this injury, this man may have a stroke?" Following an objection the Court ruled that the witness should answer. An exception was saved.

The answer was not of importance. The Doctor said, "I don't know." He then added: "I don't know, [but] I would say this: He does have "autorokosis" and could have any time." Assuming that the Doctor said *arteriosclerosis* and that the stenographer erroneously transcribed "autorokosis," the answer was but an assertion that a condition existed, from which the physician believed that paralysis might result. Preceding the question just quoted, Dr. Hodges was asked: "From an injury to the brain to the extent of a ruptured blood vessel, and to such an extent that you were required to draw blood off his spine on two occasions, (and you say you

saved his life) is it reasonable to infer from that injury that this man may have a stroke of paralysis?'' Answer: ''Any man 77 years old with hardening of the blood vessels and a hypertensive heart is liable to have [a stroke] any time. Mr. Ross' blood pressure was never high, though; in fact it was low: 110 over 80 the hospital record showed. The other day I took his blood pressure and it was 130 over 90.'' Question: ''Doctor, let's get back to the question, please: isn't it reasonably possible that this man from this injury may have a stroke?'' Answer: ''Now, Bill, I don't know about that, except that I do think the blood vessel healed where it ruptured.''

These questions and answers were not objected to. It was only when plaintiffs' attorney insisted upon a yes or no response that the objection was interposed.

It is quite clear that Dr. Hodges thought the primary injury had healed and that the hypertension spoken of was not caused by the blow Ross received.

The fourth and fifth assignments relate to instructions regarding negligence, and were not erroneous.

Appellant thinks it was error for the Court to tell the jury that the law furnishes no definite rule by which physical pain and suffering may be measured for the purpose of assessing damages, and ''this must be left to the sound discretion and judgment of the jury, based upon the evidence in the case.'' It is contended that the instruction was misleading and that it created in the minds of the jurors a belief that ''a large amount of damages might be found.'' The instruction was not erroneous. The objection as shown by the record was based in part upon appellant's contention that the jury could infer it had a right to compensate for mental pain and anguish. This phase of the instruction is not carried forward in the assignments.

Argument is made in respect of other instructions asked, and as to some refused. It is our view that no prejudice resulted and that the objections are not sound.

The judgments were not excessive. Ross was knocked to the concrete paving and suffered a brain concussion. He was unconscious for five or six days, but this condition did not immediately follow the injury. The patient, when taken home, complained of headaches, requiring hospitalization. Dr. Hodges made a spinal puncture. It disclosed a ruptured blood vessel. Blood was in the spinal fluid. Glucose was administered intravenously as nourishment. Spinal punctures were made on three occasions, after which Ross regained consciousness and began to improve. He still complains of headaches and dizziness.

Launius sustained a fracture of the pelvis bone on the left side. He was hospitalized one day and was directed to remain in bed a month. The patient complained of other injuries.

The testimony shows that each appellee suffered injuries other than those here detailed.

The record is free of prejudicial errors, and the judgments must be affirmed.